**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA,**

:

**Plaintiff,**

**v.**

**Case No. 2:26-cr-58**
**Chief Judge Sarah D. Morrison**

**KADEEM J. SMITH,**

:

**Defendant.**

**OPINION AND ORDER**

In June 2025, officers with the Columbus Police Department stopped Kadeem Smith in front of 820 Seymour Avenue for failure to signal and excessive window tint. Officers searched his vehicle based on an odor of burnt marijuana and found a stolen firearm and illegal narcotics in the driver's side door compartment. Officers later searched the residence at 820 Seymour Avenue and found two more firearms they believed belonged to Mr. Smith. Because Mr. Smith cannot lawfully possess a firearm, he was arrested. He was indicted for two counts of possession of a firearm by a convicted felon and two counts of possession of a firearm by a person convicted of a misdemeanor crime of domestic violence.

Mr. Smith filed a Motion to Suppress (Mot., ECF No. 23), and the Government responded (Resp., ECF No. 25). For the reasons below, no evidentiary hearing is necessary, and the Motion is **DENIED**.

## I. FACTUAL BACKGROUND[1]

On June 27, 2025, Columbus Police Officers Davis, Reardon, McBane, and Bateman were patrolling the south side of Columbus as a part of the Safe Streets program when they saw a Volkswagen Tiguan with dark tinted windows abruptly pull over to the curb on Seymour Avenue without using a turn signal. (*See* Govt's Ex. 1, 11:03:40.) Officers McBane and Bateman pulled behind the car as Officers Davis and Reardon pulled alongside it. (*Id.*)

Officer Davis saw the driver (later identified as Mr. Smith) bend down toward the driver's side door jamb before getting out of the car. (ECF No. 23-1, PAGEID # 60.) Officer Davis then got out of his cruiser and approached Mr. Smith, who was now standing on the curb. (Def's Ex. 3, 11:03:57.) At the same time, Officer Reardon approached the passenger (later identified as Nakita Smith (Mr. Smith's wife)) who was still in the car. (Govt's Ex. 2, 11:04:05.)

As Officer Davis approached, Mr. Smith stated that he lives at 820 Seymour Avenue and complained that officers "just got [him] the other day." (Def's Ex. 3, 11:04:02.) Officer Davis smelled a strong odor of burnt marijuana coming from Mr. Smith's vehicle. So he patted Mr. Smith down for weapons and told him that he was being detained for a narcotics investigation. (ECF No. 23-1; Def's Ex. 3, 11:04:15.) Officer McBane asked Mr. Smith if he had been smoking marijuana in the vehicle. (Govt's Ex. 3, 11:04:13.) On the other side of the car, Officer Reardon told Mrs.

[1] All citations to body camera and cruiser video footage are an approximate reference to the starting time (listed in the top right-hand corner) for the relevant portion of the footage cited.

Smith of the reason for the stop and said that he also smelled an odor of burnt marijuana coming from the car. (Govt's Ex. 2, 11:04:17.)

Next, Officer Davis escorted Mr. Smith to a police cruiser and other officers removed Mrs. Smith from the car. (Govt's Ex. 1, 11:04:41.) Meanwhile, Officer McBane opened the driver's side door and saw a firearm in the door compartment. (Govt's Ex. 3, 11:04:40.) The gun and a bottle of crushed Percocet pills were recovered from the driver's side door compartment. (*Id.*, 11:08:42.) Officer McBane also found a burnt marijuana cigarette on the center console. (*Id.*, 11:14:30.)

Officers next turned their attention to searching the home at 820 Seymour Avenue. Over the next half-hour, Officer Davis went back and forth between Mr. and Mrs. Smith in an attempt to obtain their consent to search the house. Despite his earlier statement, Mr. Smith denied living at the Seymour Avenue house and he refused to either provide or deny consent to search. (Def's Ex. 3, 11:12:00, 11:31:50.) And, despite admitting that Mr. Smith did in fact live there, Mrs. Smith also declined to provide consent. (*Id.*, 11:13:30, 11:18:15.)

When Detective Kasza arrived, he took over the conversation with Mrs. Smith. Mrs. Smith ultimately provided written consent for officers to search her home. (*See* ECF No. 25-1.) Officers conducted the search with Mrs. Smith present and found two additional firearms. (Def's Ex. 4, 11:57:48, 12:00:16, 12:10:46.)

## II. EVIDENTIARY HEARING

Mr. Smith requests an evidentiary hearing on his Motion to Suppress. (Mot., PAGEID # 49.) A defendant "is not always entitled to an evidentiary hearing."

*United States v. Lawson*, 476 F. App'x 644, 648 (6th Cir. 2012). Rather, he "must make at least some initial showing of contested facts to be entitled to such a hearing." *Id.* (quoting *United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir. 1988)). Courts should grant evidentiary hearings on motions to suppress "when the defendant alleges sufficient facts which if proven would justify relief." *United States v. McGhee*, 161 F. App'x 441, 444 (6th Cir. 2005) (citation omitted).

As explained more fully below, the uncontested video recordings undermine Mr. Smith's attempt to contest issues of fact. He has not presented any additional facts not already in the record that, if proven, would justify relief. So, the only issues before the Court are legal in nature, and no evidentiary hearing is required.

Mr. Smith's request for an evidentiary hearing is **DENIED**.

## III. ANALYSIS

The Fourth Amendment protects the "right of the people to be secure ... against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "When officials violate [the Fourth Amendment's] commands, courts generally suppress the resulting evidence." *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019) (citing *Mapp v. Ohio*, 367 U.S. 643, 648 (1961)). Mr. Smith argues the evidence being used against him should be suppressed for several reasons: (1) he was unlawfully seized; (2) his vehicle was unlawfully searched; (3) Mrs. Smith did not provide valid consent for the police to search her home; and (4) any statements he made were obtained as a result of the aforementioned Fourth Amendment violations. (Mot., PAGEID ## 53–56.)

### A. Officers lawfully seized Mr. Smith.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning [of the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). A police officer may lawfully stop an automobile and seize its passengers "when he has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012). Authority for the seizure ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

That said, an officer may prolong the seizure if, during the traffic stop, he gathers "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. One such example is when, during a lawful traffic stop, an officer smells the odor of burnt marijuana. *See United States v. Mills*, No. 5:22-cr-530, 2023 WL 3497108, *5 (N.D. Ohio May 17, 2023) (holding the odor of marijuana "alone, provide[d] a sufficient reason to prolong the stop").

Here, officers observed two violations of Ohio law: Mr. Smith's car had excessive window tint and he pulled to the curb in front of 820 Seymour Avenue without a turn signal. (*See* ECF No. 25-3.) The officers had probable cause to seize Mr. Smith and his passenger until any tasks related to the two traffic violations were complete. Then, when Officers Davis, McBane, and Reardon smelled the odor of burnt marijuana coming from the car, they had reasonable suspicion to extend the stop for a narcotics investigation.

Mr. Smith raises several counterarguments, none of which are availing. First, he argues that the officers never made a traffic stop because neither cruiser's lights were activated. But there is no requirement that an officer turn on his cruiser's overhead lights before detaining a driver based on probable cause of a traffic violation. Second, he argues that his alleged traffic violations were not captured on video. But neither the Fourth Amendment nor Ohio law requires as much. Even if the law did require that traffic violations be filmed, several officers' body camera footage shows the darkness of the car's window tint.

Finally, Mr. Smith argues that the police did not use a window tint meter to verify his window tint, so the stop was unlawful. But he ignores that he was also stopped for failing to use a turn signal. Regardless, officers do not need a window tint meter reading *before* stopping a car for excessive window tint. *See State v. Polk*, No. 07COA007, 2008 WL 186660, *3 (Ohio App. Ct. Jan. 18, 2008) ("Neither the concepts of probable cause nor 'articulable suspicion' would require that an officer have tint meter readings before making a stop for a window tint violation."). Rather, officers need only probable cause to believe that the violation "has occurred or was occurring." *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996).

The officers lawfully seized Mr. Smith based on probable cause of two traffic violations and his seizure was lawfully extended to conduct a narcotics investigation based on reasonable suspicion.

**B. Officers lawfully searched Mr. Smith's vehicle.**

"It is blackletter law that the police can lawfully search a car without a warrant if they have probable cause." *Hernandez v. Boles*, 949 F.3d 251, 259 (6th

Cir. 2020). And the Sixth Circuit "has long held that officers have the required probable cause when they detect the odor of illegal marijuana coming from the vehicle." *United States v. Brooks*, 987 F.3d 593, 599–600 (6th Cir. 2021) (collecting cases). When officers detect an odor of marijuana coming from a vehicle, they can "search every part of the vehicle and all containers found therein in which the object of the search could be hidden." *United States v. Hall*, 20 F.4th 1085, 1099 (6th Cir. 2022) (citation omitted).

The officers had probable cause to search Mr. Smith's car based on the odor of burnt marijuana here. Officer Davis smelled a strong odor of burnt marijuana coming from the car. Officer McBane asked Mr. Smith whether he had been smoking marijuana within moments of approaching the car. And Officer Reardon told Mrs. Smith that he smelled a strong odor of burnt marijuana coming from the car. The smell was subsequently corroborated when Officer McBane searched the car and found a burnt marijuana cigarette on the center console.

### C. Mrs. Smith provided valid consent for officers to search her home.

To begin, the Government contends Mr. Smith lacks standing to contest Mrs. Smith's consent to search the home at 820 Seymour Avenue. (Resp., PAGEID ##79–81.) Mr. Smith's "standing to challenge the search" of the residence "hinges on whether he had a reasonable expectation of privacy in the residence." *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009). "To establish such an expectation, [Mr. Smith] must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable." *Id.*

The Government argues Mr. Smith does not live at the Seymour Avenue home because he told officers he lives elsewhere with his grandmother. (Resp., PAGEID # 81.) But Mrs. Smith told the officers that Mr. Smith does, in fact, live at the address. Moreover, Mr. Smith's listed address with his federal probation officer is 820 Seymour Avenue, and he concedes in his Motion that he lived at the address. (Mot., PAGEID # 54.) Thus, Mr. Smith lived, at least in part, at 820 Seymour Avenue. Even if he was being untruthful with police, he still had both a subjective and objective expectation of privacy in his home *Cf. United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005) ("A place to be searched, however, need not be the defendant's home, temporary or otherwise, in order for him to enjoy a reasonable expectation of privacy there." (citation modified)). He has standing to challenge Mrs. Smith's consent.

As for the search, consent "avoids the need for a warrant," but "the consent must be voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Sheckles*, 996 F.3d 330, 346 (6th Cir. 2021) (internal quotations and citation omitted). "[T]here is no 'magic' formula or equation that a court must apply in all cases to determine whether consent was validly and voluntarily given." *United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999). Rather, it is based on the totality of the circumstances, and courts should weigh factors such as: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention;

and the use of coercive or punishing conduct by the police." *Id.* at 386 (internal quotations and citation omitted). Consent must reflect "an unequivocal statement of free and voluntary" will, as opposed to "merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *Id.* (citation omitted). "The government must prove that a party consented to a search by a preponderance of the evidence." *Sheckles*, 996 F.3d at 346.

Mr. Smith does not question Mrs. Smith's age, intelligence, or education. So, the Court need not consider those factors here. As for the next factor, Officer Davis advised Mrs. Smith of her right to refuse consent. (Def's Ex. 3, 11:14:26); *see United States v. Hinson*, 681 F. Supp. 3d 789, 799 (N.D. Ohio 2023) ("[K]nowledge of a right to refuse is highly relevant to evaluating consent." (citation modified)). Detective Kasza also advised Mrs. Smith that she could tell officers to stop their search at any time. (Def's Ex. 3, 11:42:30.) And despite being present during the entire search, Mrs. Smith never asked officers to stop.

Equally important to both whether Mrs. Smith understood her right to refuse consent and whether she understood her constitutional rights is that she signed a written form providing consent to search without a warrant. (*See* ECF No. 25-1.) That form states that Mrs. Smith was "informed of [her] constitutional right not to have a search made of [her] premises … without a search warrant[,] [n]o promises, threats, duress, or coercion have been made to [her] or against [her,]" and that she had "been informed of [her] right to refuse consent to such a search[.]" (*Id.*); *see*

*United States v. Calhoun*, 49 F.3d 231, 234 (6th Cir. 1995) ("Calhoun's consent to the search was voluntary as evidenced by her freely signing the consent form[.]").

Turning to the length and nature of Mrs. Smith's detention, the Court notes that putting a nearly eight-month pregnant woman in the back of a warm police cruiser for an extended period of time might not be the most ideal environment—but it is not inherently coercive. Being in police custody is not enough to invalidate an otherwise valid consent to search. *See United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced … consent to search.").

Lastly, the officers' tactics were not coercive. For example, Officer Davis's statement that he would be forced to write a search warrant (which would take several hours) if Mrs. Smith denied consent does not taint the validity of her consent. *See United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998) ("It is well-settled that the agent's statements to the effect that [he] would obtain a warrant if Salvo did not consent to the search does not taint Salvo's consent to a search." (collecting cases)). There is no allegation that Officer Davis's statement that he would get a search warrant was a baseless threat. *See id.*

The Court recognizes that Detective Kasza's statement regarding potential charges against Mrs. Smith might, on its face, appear to be a tactic to elicit cooperation. But there are no allegations that Detective Kasza's statement was baseless: a stolen firearm and drugs were found in Mr. and Mrs. Smith's vehicle, and officers believed additional firearms would be found in Mrs. Smith's home. *See*,

*e.g.*, *United States v. Daniel*, No. 4:04-CR-017, 2006 WL 753082, *2 (W.D. Ky. Mar. 22, 2006) ("It is not coercive for officers to discuss realistic penalties or results for cooperation or non-cooperation." (citation omitted)).

Based on the totality of the circumstances, the Court finds Mrs. Smith knowingly and voluntarily provided consent for officers to search her home.

**D. Mr. Smith's statements will not be suppressed.**

Mr. Smith argues his "statements must be suppressed as they were obtained as fruit of an unreasonable search and seizure." (Mot., PAGEID # 56.) But as explained above, there were no Fourth Amendment violations. So, Mr. Smith's statements were not obtained as the result of constitutional violations.

To the extent Mr. Smith intended to argue his statements were obtained in violation of the Fifth Amendment (*see* Mot., PAGEID # 49), he provides no analysis for the Court to consider. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quotation and alteration omitted). Accordingly, the Court need not delve into a Fifth Amendment analysis here.

## IV. CONCLUSION

The Motion to Suppress (ECF No. 23) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**